IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CHRISTOPHER FRISON, | Case No.: 3:21-cv-01618-AN |
| Plaintiff, | |
| v. | |
| UNITED STATES, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| Defendant. | |

Plaintiff Christopher Frison filed this action in Multnomah County Circuit Court on June 11, 2021, asserting a single claim for assault. Defendant United States[1] removed to federal court pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2679(d)(2), 42 U.S.C. § 233(c). The Court held a half-day court trial as to liability on May 28, 2025, during which the Court heard argument, received evidence from the parties, and heard testimony from plaintiff, witness Joshua Allan Jones ("Jones"), and plaintiff's expert witness William McKnight ("McKnight"). For the following reasons, the Court finds in favor of plaintiff as to liability. Within thirty (30) days of the date of these Findings of Fact and Conclusions of Law, the parties shall confer and submit to the Court their availability for a telephone status conference to discuss the damages phase of this case.

## BACKGROUND

### A.     Stipulated Facts

Jones, a United States Customs and Border Patrol ("CBP") Agent, was on work assignment in Portland, Oregon, during the summer of 2020. Def. Trial Mem., ECF [66], at 2, 5; Tr. of Court Trial

---

[1] As described in greater detail in the Background section of these Findings of Fact and Conclusions of Law, *infra*, plaintiff initially filed this action against a John Doe defendant, who plaintiff identified as an "unidentified federal agent." Notice of Removal, ECF [1], Ex. 1. Plaintiff then amended the complaint to name Joshua Allan Jones ("Jones") as defendant. *Id.* at Ex. 2. Upon removing the action to federal court, defendant United States substituted itself as party defendant in place of Jones. *Id.* at 3. All references to "defendant" in these Findings of Fact and Conclusions of Law refer to the United States.

("Tr.") 106:5-11 (Jones); *see* Pl. Trial Mem., ECF [65], at 2.  While on this assignment, Jones resided in room 428 of the Residence Inn by Marriott (the "Hotel"), located at 1250 North Anchor Way, Portland, Oregon.  2d Am. Compl. ("Compl."), ECF [18], ¶ 2; Answer, ECF [22], ¶ 2; Def. Trial Mem. 2; *see* Pl. Trial Mem. 3.  Plaintiff worked for the Hotel as a maintenance person.  Compl. ¶ 2; *see* Pl. Trial Mem. 2-3; Def. Trial Mem. 2.  On July 27, 2020, Jones sought Hotel maintenance assistance for a clogged toilet.  Tr. 109:5-17 (Jones); Def. Trial Mem. 6; *see* Compl. ¶ 2; Pl. Trial Mem. 2, 5 (footnote omitted).  Plaintiff responded to the maintenance request and knocked on the door to Jones' hotel room.  *See* Compl. ¶ 3; Answer ¶ 3; Pl. Trial Mem. 3; Def. Trial Mem. 6.  The parties agree that Jones had a gun when he answered the door, though they disagree as to whether Jones was holding the gun at his side with his finger off the trigger (as Jones contends) or whether Jones quickly pulled the gun out from behind him and pointed it at plaintiff (as plaintiff contends).  *Contrast* Def. Trial Mem. 6, *with* Pl. Trial Mem. 2-3, 5.  The parties' factual account of the event otherwise differs, as described next.

**B.     Procedural History and Development of Contested Facts**

> 1.     *Plaintiff's Allegations and Defendant's Admissions and Denials*

On June 11, 2021, plaintiff filed this action in Multnomah County Circuit Court against a single John Doe defendant, identified only as "an unidentified federal agent."  Notice of Removal ¶ 1 & Ex. 2, at 1 (all references to ECF pagination).  In the initial complaint, plaintiff alleged that the John Doe defendant "aggressively pointed a semiautomatic handgun at [plaintiff's] chest, causing [him] to fear for his life and causing him fright and horror and nightmares."  *Id.* at Ex. 2, at 1.  Plaintiff alleged that the John Doe defendant "was in Portland for several days on business as a federal agent deployed . . . to tamp down protests[,]" and that "the federal agents deployed in Portland . . . did not have proper training."  *Id.*  Plaintiff alleged that on July 27, 2020, at approximately 4:00 p.m., he arrived at room 428, "respond[ing] to a maintenance request to unclog the toilet[.]"  *Id.* at Ex. 2, at 2.  Upon arrival, he "knocked on [the] door and identified himself as a maintenance person."  *Id.*  Plaintiff alleged that the John Doe defendant then "violently swung open the door, and with an aggressive look on his face, pointed a semiautomatic handgun at [plaintiff]'s chest."  *Id.*  Plaintiff "put his hands in the air and prepared to be killed" until the John Doe

defendant lowered the gun. *Id.* Thereafter, the John Doe defendant invited plaintiff into the room, which invitation plaintiff declined. *Id.* Instead, plaintiff "handed [the John Doe defendant] the toilet plunger[] and quickly left room 428." *Id.* Plaintiff alleged that this conduct amounted to an "intentional[] attempt[] to engage in harmful or offensive contact with [plaintiff]," and that the John Doe defendant "had the present ability to carry the intention into effect, causing [plaintiff] extreme emotional distress." *Id.* at Ex. 2, at 3.

On September 30, 2021, plaintiff filed a first amended complaint, substituting Jones as party defendant. *Id.* ¶ 1 & Ex. 3. Other than substituting "Jones" for all references to "Mr. Doe," the allegations in the first amended complaint were identical to those set forth in the initial complaint. *Compare id.* at Ex. 2, at 1-4, *with id.* at Ex. 2, at 9-12.

On November 5, 2021, defendant removed the case to federal court and substituted itself as party defendant in place of Jones upon its certification that Jones was acting within the course and scope of his employment with CBP at the time of the incident. *Id.* ¶¶ 4-5 & Ex. 1. The case was assigned to Magistrate Judge Youlee Yim You. Notice of Case Assignment, ECF [2]. On January 5, 2022, plaintiff moved to strike the scope of employment certification. Pl. Mot. to Strike Cert., ECF [7]. Judge You denied the motion. Op. & Order of May 6, 2022, ECF [10].

On May 20, 2022, defendant filed an answer to the first amended complaint. ECF [11]. In relevant part, defendant denied that Jones raised his firearm or pointed it at plaintiff's chest and denied that plaintiff put his hands in the air. *Id.* ¶¶ 1, 3.

On December 21, 2022, with defendant's consent, plaintiff filed a second amended complaint ("SAC"). In the SAC, plaintiff's account of the parties' actions on the day of the incident remained substantively identical to his previous complaints. However, the SAC differed from the previous complaints in a few ways, including that it removed plaintiff's allegations that Jones "was in Portland for several days on business as a federal agent deployed . . . to tamp down protests[,]" and that "the federal agents deployed in Portland . . . did not have proper training"; and it added allegations regarding whether Jones was working within the scope of his employment, plaintiff's administrative claim, and defendant's denial of plaintiff's administrative claim. *Compare* Notice of Removal Ex. 2, at 9-12, *with* Compl. ¶¶ 2, 4.

The SAC also contained an allegation that Jones "would sometimes consume alcohol" during his personal time and that the incident at issue in this case in fact occurred on Jones' personal time. *See* Compl. ¶ 4.

On January 25, 2023, defendant filed an answer to plaintiff's SAC. This answer was identical to the prior answer as to defendant's denials and admissions mentioned above. Additionally, in relevant part, defendant admitted that Jones was wearing civilian clothing when he answered the door; that defendant received a Standard Form-95 Claim for Damage, Injury or Death from plaintiff on November 10, 2020; and that defendant denied plaintiff's claim by letter dated May 4, 2021. Answer, ECF [22], ¶ 4. Jones denied "any allegations concerning alcohol" to the extent they "mischaracterize or misstate applicable policies, guidelines, procedures, directives, regulations, statutes or other authorities[,]" and to the extent they are inconsistent with Jones' deposition testimony. *Id.*

On March 10, 2025, the case was reassigned to District Judge Adrienne Nelson. Notice of Case Reassignment, ECF [56]. Shortly thereafter, the Court set a half-day court trial for May 28, 2025. Mins. of Proceedings of March 31, 2025, ECF [58].

      2.   *Pretrial Filings*

In his trial memorandum, plaintiff maintains he "remembers knocking on the door to room 428, the door swinging open, and seeing a man with a handgun, and fearing for his life when the handgun was pointed at him." Pl. Trial Mem. 3. However, plaintiff argues that the Court should find for plaintiff as to liability regardless of whether the Court finds that Jones pointed the gun at him, because "the mere act of presenting the handgun to [plaintiff] under these circumstances constitutes civil assault under Oregon law[.]" *Id.* at 6. As such, plaintiff asserts that "the issue of whether the handgun was [] pointed at [plaintiff] as he recollects is a fact that may be best reserved for the damages phase of the case." *Id.*

In its trial memorandum, defendant asserted that "[a]t some point on July 27, 2020, [] Jones submitted a maintenance request[,]" and "[a]t approximately 4:15 p.m., [] Jones was getting his gear ready for his evening shift when [plaintiff] knocked at the door." Def. Trial Mem. 6. "Jones did not know who knocked on the door but assumed it was a colleague[,]" and he "answered the door with his service-issued firearm in his hand pointed straight down at the ground and his finger off the trigger." *Id.* Defendant

asserted that "[u]pon seeing [plaintiff] [] Jones recalled his maintenance request . . . [,] put his firearm away[,] and asked if [plaintiff] would plunge the toilet." *Id.* Plaintiff "declined, handed [] Jones a plunger, and left." *Id.* Defendant argued that plaintiff cannot prove his assault claim without proving that Jones pointed the gun at plaintiff, and plaintiff cannot prove that Jones pointed the gun at plaintiff because his "story . . . is not credible"; his "details do not add up"; and "the evidence will show [that plaintiff] is not a trustworthy witness." *Id.* at 8. Defendant asserted that plaintiff's new "presentment" theory of liability is legally incorrect and should be precluded because it was only raised for the first time in plaintiff's pretrial filings. *Id.* at 8-9. Based on that argument, defendant moved *in limine* "to preclude [p]laintiff [] from raising his unpled 'presentation' theory at trial." Def. Mot. in Limine, ECF [70], at 2.

Before trial began, the Court heard argument as to the issue of presentment. Defendant asserted that plaintiff's argument that the Court may still find liability even if it does not find that Jones pointed the gun at plaintiff is, in essence, a "changing [of] his theory of the case after discovery, after expert deadlines have passed, and [where] defendant is still unclear of what presentment means[.]" Tr. 8:4-13. Plaintiff argued that the facts of the case have always remained the same and called "presentment" a "kind of [] technical term" that describes "the process [of] raising a gun and pointing it at the target and extending your hands toward the target[,]" which description aligns with the facts that plaintiff has always alleged occurred. Tr. 8:14-9:8. Plaintiff otherwise agreed not to use the term "presentment" during trial. *See* Tr. 10:10-11, 13:5-11. The Court denied defendant's motion *in limine* as to this issue and accepted plaintiff's stipulation to avoid use of the word "presentment." Tr. 14:5-8.

Prior to trial, defendant also moved *in limine* to exclude two exhibits proposed by plaintiff—the CBP Standards of Conduct, dated March 13, 2012, and a CBP Table of Offenses and Penalties—arguing that the exhibits were not relevant and that "any minimal probative value of the[] exhibits is substantially outweighed by the fact that they will cause undue delay and waste time." Def. Objs. to Pl. Exs., ECF [71], at 2. Before trial began, the Court heard argument as to this issue. Plaintiff argued the exhibits were "policies of [CBP] conduct that [] Jones [was] expected to follow while he was deployed [] in Portland[,]" and that the exhibits explained "what the standards of conduct were" and were

relevant to Jones' motive and bias; *e.g.*, that they were "relevant to whether [] Jones would have faced discipline had he admitted that the[] events took place [as plaintiff alleged]." Tr. 3:6-20. Defendant argued that "whether [] Jones would have faced discipline if [the alleged events] had taken place does not speak to whether the incident actually happened[,]" and it is therefore "unclear what the motive would be[.]" Tr. 3:21-4:2. The Court overruled defendant's objections to the exhibits, noting that they would "not delay or waste time[.]" Tr. 4:3-8.

Finally, plaintiff objected to defendant's exhibits regarding plaintiff's medical records on the grounds of lack of authentication, lack of foundation, irrelevance, risk of unfair prejudice, and hearsay. *See* Pl. Obj. to Def. Exs., ECF [73], at 2. The Court also heard argument as to this issue prior to trial. Defendant argued that the health records are relevant to liability issues because they contain "admissions [] about the events that took place" and demonstrate that plaintiff has medical conditions "relevant to his perception[] [and] cogniti[on]" that speak to his capacity and the reliability of his memory. Tr. 14:25-15:19, 64:8-12; *see also* Tr. 64:21-66:13. Plaintiff conceded that the records may be admissible for impeachment purposes but argued that they are not admissible for the purpose of asserting that plaintiff has any specific medical condition. *See* Tr. 15:20-17:16, 62:25-64:7. The Court ruled that plaintiff's statements to his medical providers were admissible, but that "[c]onditions he may have and diagnoses" would not be permitted. Tr. 67:9-13.

3.     *Trial Testimony*

During trial, the Court heard testimony from McKnight, plaintiff, and Jones. This testimony is summarized below.

a.     McKnight

At trial, plaintiff sought to introduce the expert testimony of McKnight, a firearms and use of force instructor with knowledge and skill in the field of handgun safety as well as experience training a variety of persons as to a range of weapons and types of guns. *See* Tr. 20:10-21:21; 23:18-20. McKnight testified that he formed opinions in this case based on "[r]elatively universal rules of firearm manipulations, firearm safety, [and] firearms protocols." Tr. 23:7-13. Defendant objected to McKnight being qualified as

an expert, arguing that he did not have specific "experience involv[ing] federal law enforcement agency or federal law enforcement work[,]" meaning that "all he c[ould] do [wa]s assume that what he describe[d] as his universal training of handgun safety would apply and is relevant to [] Jones[.]" Tr. 24:1-16. The Court overruled defendant's objection and qualified McKnight as an expert. Tr. 24:23-25.

McKnight opined as to several issues. McKnight answered in the negative when asked whether it would "be consistent with handgun training and mechanics and safety [for Jones] to have pointed his weapon" when plaintiff knocked on the door. Tr. 26:15-27:1. He stated that plaintiff's description of Jones' stance upon opening the door was consistent with what he would expect Jones' stance to be under the circumstances Jones described at deposition—*i.e.*, his concern about Antifa having found the Hotel and his testimony as to self-defense—and that the stance and circumstances together were consistent with Jones having pointed the gun. *See* Tr. 27:2-28:18, 34:23-35:11. He opined that it would "[a]bsolutely not" be consistent with handgun safety and training "to draw a weapon and then just kind of leave it at your side as you open the door if [one was] perceiving a threat[,]" Tr. 28:19-22; noted that holding a gun at one's side is called "dangling[,]" is "generally forbidden[,]" and is "not what a professional would be expected to do[,]" Tr. 29:4-11; and noted that, as a matter of handgun safety, one does not carry a gun in their hand without having a purpose, *see* Tr. 29:12-19, because otherwise, one risks scaring people, accidental discharges, or "systemic overload[,]" Tr. 29:24-31:2. McKnight opined that the principles of gun safety require that one "always know[s] the status of [their] gun[,]" in part for officer safety, Tr. 31:3-25; as well as to general handgun safety rules about storing handguns when not on one's person, *see* Tr. 32:13-33:4. He stated that he "wouldn't think" that an officer would ever set a handgun down in a room and then invite a person they do not know into that room. Tr. 33:5-10.

On cross-examination, McKnight noted that in forming his opinion, he found relevant that plaintiff generally lacked familiarity with guns, *see* Tr. 39:6-18, and acknowledged that he did not know what guns plaintiff might have been trained on while in the National Guard, *see* Tr. 40:1-6, and did not review plaintiff's medical records, *see* Tr. 40:7-9, 40:19-22. McKnight testified that he believed plaintiff is "unfamiliar with guns" and that he did not think that plaintiff would "know what the correct stance is unless

it's performed in front of him[,]" Tr. 46:8-17.  However, McKnight conceded that it was possible that plaintiff could have seen the stance he described Jones to have held from media or somewhere else.  *See* Tr. 44:7-16.  McKnight opined that it makes "[n]o sense" that a highly trained law enforcement officer would remove the magazine from his firearm the way that plaintiff testified at deposition that Jones did, Tr. 46:24-47:11, and that it made "[n]o[] [sense] whatsoever" that Jones would put his gun down on the floor, turn his back, and walk away from plaintiff, Tr. 48:10-49:1.  When asked what he made of plaintiff's deposition testimony on these points, McKnight responded that he "[did not] believe it[,]" "c[ould] [not] imagine a federal officer putting his firearm on the ground when an unknown person [was] in the room[,]" and "frankly [did not] know what to make of [it]"; contrary to plaintiff's deposition testimony, McKnight would expect an officer to, for example, "lock the slide to the rear, empty the magazine, [and] put [the firearm] on a table maybe if you wanted for whatever reason to show it's safe[.]"  Tr. 49:2-12.

   b.   Plaintiff

     In relevant part, plaintiff testified at trial as follows.  Regarding the incident, plaintiff testified that he received a call to unplug a toilet in room 428 of the Hotel at around 4:30 p.m.  *See* Tr. 51:17-20, 83:16-20.  He testified that he was familiar with the room because he generally did a lot of maintenance, "popping into every room [at the Hotel]."  Tr. 51:21-25.  Plaintiff arrived at room 428 approximately twenty minutes after receiving the call and, while wearing a blue shirt with a Marriott emblem and nametag and holding only a plunger, knocked on the door and announced himself, stating, "Maintenance, Christopher Frison[.]"  Tr. 52:1-17, 83:19-84:19.  He testified that he usually announces himself "[t]o ease the guests and let them know it's maintenance and [he is] Christopher."  Tr. 52:18-22.  At deposition, plaintiff testified that he believed someone looking through the peephole of the door would have seen the plunger; at trial, he stated that they would not have seen the plunger because he was holding it by his side.  Plaintiff clarified the conflicting testimony by noting that room 428 "was a handicapped room with two peepholes, one at the top and one at the bottom[,]" which is why he would have stated at deposition that the plunger could be seen through the peephole.  Tr. 85:6-12.  Plaintiff testified that he believed Jones looked through both peepholes; plaintiff knocked on the door three separate times and said, "Maintenance,

Christopher Frison" each time he knocked; and Jones saw plaintiff in his Marriott uniform through the peephole. *See* Tr. 85:13-25; Tr. 91:2-4.

Plaintiff testified that next, "Jones snatched the door open [] and looked at [plaintiff] with hate in his eyes"; Jones opened the door "real fast"; and generally, guests "never" open the door fast the way Jones did. Tr. 52:23-25, 53:14-23, 86:1-2 (stating that Jones "[s]lung the door open"). He testified that he did not know what Jones was doing before he opened the door and that when he opened it, he did not have a handgun in his hand. *See* Tr. 86:3-10. Thereafter, Jones reached behind his back, pulled a gun out, and pointed it at plaintiff's chest—all of which happened "fast." *See* Tr. 54:10-55:3, 56:8-12, 56:16-18, 86:20-87:10, 88:7-16. Plaintiff testified that he did not think Jones could have been "getting the gun out to hand it to [plaintiff]" because of the look on Jones' face at the time. Tr. 55:14-56:3. He testified that Jones pointed the gun at him for somewhere around four to six seconds and did not "lower[] the gun until he came to his senses[,]" which was somewhere between six to nine seconds after the gun was initially drawn. Tr. 90:11-91:1. Plaintiff described Jones' stance at this time as having his arms stretched all the way out with neither elbow bent. *See* Tr. 88:17-20. Plaintiff could not estimate how far away Jones was from plaintiff, though he testified that it was "[c]lose enough to scare the hell out of [him]" and that Jones was probably within plaintiff's reach. *See* Tr. 88:21-89:18. When asked whether he testified at deposition that Jones' gun was two or three feet away from him, plaintiff again responded as to his discomfort with calculating distances and that he "s[aw] the gun in front of [him][;] [Jones] was close enough." Tr. 90:7-10.

Plaintiff testified that upon Jones pointing the gun at him, plaintiff was first to speak, saying, "[W]hat the hell you doing? What's going on? . . . [W]hat are you doing?" Tr. 56:19-24. When he questioned Jones in that moment, plaintiff testified he "was screaming at the top of his lungs" "very loud[ly]" because he "was afraid and [] wanted [Jones] to see who [he] was[.]" Tr. 91:18-25. He did not, however, see anybody else open their hotel room door to see what was going on. Tr. 92:1-6. Thereafter, he told Jones "to get the hell out of [his] hotel[.]" Tr. 92:4-6*; see also* Tr. 95:14-17. Jones did not respond, but kept the gun pointed at plaintiff for approximately four or five seconds. Tr. 56:25-57:3. When asked

whether he put his hands in the air when Jones pointed the gun at him, plaintiff testified that he "d[id not] know if he put [his] hands in the air, [] d[id not] know if [he] put [his] hands to the side[,]" that "[e]verything happened so fast" and he "did [not] move." Tr. 92:13-20. Plaintiff testified that Jones then stated, "[O]h, I fucked up, I fucked up," then "took [the] clip out of his gun . . . and turned to the side of his door and put the gun on the floor" before inviting plaintiff into the room to plunge the toilet. Tr. 57:4-8, 92:21-93:1. Plaintiff testified that he handed Jones the plunger, then watched Jones turn his back and walk into the room while the door slowly closed behind him and with the gun still on the ground behind the door. *See* Tr. 93:2-15.

Plaintiff maintained that he saw Jones "put the gun on the floor" because "when [Jones] took the clip out [of] the gun[,]" Jones bent down "and put [the gun] behind the door, [and] there's no tables there, just the floor." Tr. 57:12-17. Plaintiff stated that he did not think it was possible that Jones could have moved a table there before plaintiff arrived because there is only one large coffee table in in the room, which he noticed was covered with items. Tr. 57:22-58:2. Plaintiff testified that he never went into the room, in part because he believed his life would be in danger if he did. *See* Tr. 58:5-59:2. Plaintiff testified that he then handed Jones the plunger; Jones took his foot off the door, turned his back, and went towards the bathroom; the door closed behind Jones; and plaintiff immediately went to the Hotel front desk to obtain Jones' information. Tr. 59:3-13. Plaintiff testified that Jones did not make any physical contact with him during the incident. *See* Tr. 97:17-19. Defendant ultimately elicited conflicting testimony from plaintiff that some details of the incident are "a fog" for plaintiff. *See* Tr. 96:3-14.

Plaintiff also provided testimony regarding his life generally, including before and after the incident. Regarding before the incident, plaintiff testified as to his service in the National Guard in 1982. *See* Tr. 50:22-51:4. He stated that he has "pretty much" not held a gun since being in the National Guard; however, after noting that his son is often at his house with weapons, plaintiff stated that "every now and then [he] might touch one" and then clarified that he has indeed held a gun since being in the National Guard. Tr. 71:6-14. He testified that he does not carry a gun, in part because it is prohibited for him to. Tr. 71:15-19. Defendant also elicited testimony from plaintiff on cross-examination regarding previous

times in his life in which he has had a gun pointed at him, including in around 2007, when a federal marshal pointed a gun at him from some distance further than eighteen feet away from him; in 2009, when he "[was] jumped and someone pulled a gun" on him; and in 2017, when someone tried to rob him at gunpoint. Tr. 80:20-81:9. During the robbery, plaintiff testified he "went to go call the police" and said, "You going to shoot me, you going to shoot me in the back," at the time. Tr. 81:10-15.

Plaintiff testified that during the summer of 2020, he worked the evening shift at the Hotel but did not feel safe working this shift and had repeatedly asked his boss to switch him to day shift, including once shortly before the incident, which request his employer denied. *See* Tr. 81:16-82:7. Plaintiff denied feeling victimized by his boss for having to work at night. *See* Tr. 82:11-13. Plaintiff did, however, affirm that he filed a discrimination complaint with the Bureau of Labor and Industries about his employer's denial of his request for shift change. *See* Tr. 82:22-83:13.

Plaintiff also affirmed that on July 29, 2020, two days after the incident, he wrote a three-page letter to his employer about the events that occurred. *See* Tr. 94:3-5. In the letter, plaintiff did not state that Jones said, "I fucked up"; however, plaintiff did state that when he yelled out, "[H]ey, hey," that Jones "sighed . . . and . . . said, 'I'm stressed.'" Tr. 94:13-95:1. At trial, plaintiff testified that he could not remember whether Jones said, "I'm stressed," or whether Jones sighed, but that plaintiff did "remember [Jones] saying he fucked up." Tr. 95:2-14. He testified that Jones "[p]robably" also said, "hey, hey," after lowering the gun, but that plaintiff generally could not remember considering the effect of having a gun pointed at him and the duration of time between the events and trial. Tr. 95:7-24.

Defendant also questioned plaintiff as to several statements he made to his medical providers. Plaintiff acknowledged that in November of 2020, following the incident, plaintiff stated to a medical provider that he "[p]eriodically, sometimes, [] when [his] son is over," keeps a gun next to him. Tr. 73:11-14. Plaintiff acknowledged he "might have said something" to a medical provider such as that "when [he] hear[s] a noise when [he is] at home, [he] reach[es] for a gun[,]" but that "[i]t's been so long" since seeing those medical providers that he "can't remember back that far[.]" Tr. 73:15-25. When presented with a medical record from that time, plaintiff denied memory of telling the medical provider that

"his primary coping skill when he is out in the community is to carry his gun"; that he "feel[s] strong when [he] carr[ies] it"; that he reaches for a gun when he hears a noise at home; or that he carries an unlicensed weapon. Tr. 74:7-75:18. Finally, defendant questioned plaintiff regarding a medical record made by a Dr. Ronald Turco, who was hired to evaluate plaintiff for worker's compensation benefits following the incident and who stated in the resulting medical record that plaintiff reported that Jones pulled the trigger; that plaintiff heard the gun click; and that if the safety had not been on, plaintiff believes he would have been dead. *See* Tr. 75:22-78:1, 78:13-15. Plaintiff disclaimed memory of stating that Jones pulled the trigger and testified that he "might have said it felt like he pulled a trigger." Tr. 76:16-20. Plaintiff stated he could not remember whether he told his employer that Jones pulled the trigger or whether he stated at deposition that Jones pulled the trigger. *See* Tr. 78:2-7. Plaintiff also testified on cross-examination that he has cataracts, which affect his eyesight. *See* Tr. 79:13-20.

      c.     Jones

      In relevant part, Jones testified at trial as follows. Jones testified as to his experience as a CBP agent and with guns generally. Prior to his work with CBP, Jones "was active duty Navy from 2000 to 2006, and then Navy reserves from 2007 until 2020," when he was honorably discharged. Tr. 121:20-122:1. From approximately 2012 to 2022, Jones was a Border Patrol agent, and in 2022, he was promoted to Supervisory Border Patrol agent. *See* Tr. 103:19-104:2. In 2014, Jones "became a member of the BORTAC team, which is the Border Patrol tactical unit [that does] more targeted enforcement on high-risk threats." Tr. 104:10-13, 104:23-105:6. Also in 2014, Jones began training other Border Patrol agents, which he still does now. *See* Tr. 123:4-13. He testified as to his "[e]xtensive[]" training with firearms and noted that he would never point a gun at someone within two or three feet away with his arms extended because "it gives whoever is in front of [him] the ability to grab [his] weapon, knock it out of [his] hand, or essentially compromise [his] ability to control [it]." Tr. 105:12-13, 127:18-129:1 (emphasizing that since 2012, his training has been to give "a slight bend in the elbows"). He stated he is trained to identify himself and provide a verbal command when pointing a firearm at somebody. *See* Tr. 131:3-10. Jones also testified to his experience executing high-risk warrants prior to July of 2020 and described his emotional state when

executing high-risk warrants as "[t]he three Cs": "Cool, calm and collected." Tr. 122:2-24.

Jones also testified as to the standards of conduct he was and is expected to follow as a CBP agent. He testified that the standards of conduct forbid employees from "provok[ing], participat[ing] in or condon[ing] activities that may cause, lead to or involve violence in the workplace[,]" "includ[ing] communicating a direct or indirect threat of physical, mental or emotional harm." Tr. 115:9-22. He affirmed that, based on the table of offenses and penalties, an officer who acted in conformance with the "third category of disruptive behavior [for fighting, threatening, attempting to inflict or inflicting bodily harm to another, engaging in dangerous horseplay, any violent act, language, gestures or conduct towards members of the public or coworkers] . . . would result in . . . [] [five] days' suspension up to removal[.]" Tr. 116:5-14. Jones also affirmed that "there is a five-day suspension up to removal for inappropriate display of a weapon[.]" Tr. 116:15-18.

Regarding the summer of 2020 generally, Jones was in Portland as part of the BORTAC unit. *See* Tr. 104:14-22. He worked an evening shift with a typical start time of 6:00 p.m., and his team would meet prior to the shift in the Hotel lobby, at around 5:00 p.m., before proceeding together to the Edith Green-Wendell Wyatt Federal Building. *See* Tr. 107:14-24. Jones stated that he "may have" purchased alcohol while on deployment in Portland but did not recall drinking while on deployment. Tr. 107:2-13. Jones testified that he was attacked multiple times during the protests that summer, including at "[v]arious times ha[ving] hard objects launched at [him], thrown at [him], high-powered lasers shined in [his] eyes[,]" as well as "improvised explosive devices tossed into the courtyard and at [the CBP agents] [and] gas canisters thrown back at [the CBP agents]" and "every hard object that people could find . . . were all being launched at [the CBP agents, who] were targeted 100 percent." Tr. 113:3-4, 114:7-18. At the protests, Jones "was part of th[e] effort to assist with crowd control" and himself "deploy[ed] crowd control munitions[.]" Tr. 113:8-11.

Jones also testified as to the events of July 27, 2020, including the events preceding, making up, and following his interaction with plaintiff. Jones testified that he did not have any specific memories of what happened prior to his interactions with plaintiff, other than that he used and clogged the toilet and

therefore called Hotel maintenance for assistance. *See* Tr. 109:2-17. Jones had "no clue" how long it was between him calling for maintenance and plaintiff arriving at his room. Tr. 109:18-22. He heard plaintiff's knock at the door. Tr. 109:23-110:03. At that time, Jones testified he had a handgun on his person with either a ten- or twelve-round magazine. *See* Tr. 110:4-16. He testified that he would typically keep twelve rounds in the chamber but did not know whether the gun was loaded or not when he answered the door. *See* Tr. 110:17-19, 118:6-9. He also testified that he typically stored his duty weapons "loaded and in the holster[,]" but that at the time of the incident, his gun was not in its holster. Tr. 110:20-23. He noted that he "c[ould not] be a hundred percent sure exactly what [he] was doing but it was a pretty routine practice to inspect any gear that [he] had before the next shift started." Tr. 110:25-111:6; *see also* Tr. 124:11-21. He further noted that it was common to have firearms in his hands around his teammates, for example, in the gym after their morning workouts and when preparing for their shifts. *See* Tr. 126:19-127:8.

Jones testified that he "d[id no]t remember every specific detail, but [that he] heard a knock at the door, [] walked to the door [and] opened it" with his firearm "in [his] right hand, straight down at [his] side, with [his] trigger finger indexed along the side." Tr. 125:9-17, 126:6-8. He further testified that he does not ever keep a pistol behind his back because he "feel[s] like it's a stupid place to carry a weapon"; carrying behind the back gives less control and visibility of the weapon; and he does not own any holsters that allow him to carry behind his back. Tr. 131:11-17. Upon answering the door, Jones "immediately recognized there was a maintenance guy" because he saw the man had a plunger and then "immediately remembered that [he had] called for maintenance[.]" Tr. 125:9-23. Following the interaction with plaintiff, Jones testified that he "holstered the weapon [in a holster not on his body] and set it somewhere in th[e] general area" of the kitchen area to his right. Tr. 118:10-18. He then "said something to the effect of let me put this away, meaning—referring to [the gun], and asked [plaintiff] if he wanted to come in and take a look[,]" and that plaintiff then "handed [Jones] the plunger and that was the end of it." Tr. 125:9-17; *see* Tr. 129:23-130:4. Thereafter, Jones fixed the toilet with the plunger and, though he could not specifically recall, estimated based on the timing that "it would have [then] been about time to go downstairs to [] head down [] for work." Tr. 130:5-10.

Jones testified that he never determined who was at the door prior to opening it; never pointed the gun at plaintiff; never intended to harm the person knocking at the door; never stated, "I fucked up"; and at no point acted in any way aggressively toward plaintiff. Tr. 118:19-21, 125:24-126:5, 126:9-18, 130:11-131:2. He simply assumed it was a teammate knocking because "[i]t seemed the most likely person to be [] knocking on the door[,]" because he "was [in Portland] for a very short period of time" and "do[es]n't know anybody [in Portland], and wasn't expecting any visitors." Tr. 123:18-124:2. It did not occur to him prior to opening the door that it was a maintenance person, because of "[d]ifferent things going on in terms of getting prepared for the day" and because "once the toilet issue came up and then [Jones] made a call to the desk for maintenance, it kind of went to the back burner because that task had been addressed, and so it was out of [his] hands as far as what [he] needed to do." Tr. 124:3-10. Additionally, Jones testified that although it would have given him information about who was behind the door, the fact remained that "[i]t never occurred to [him]" to look through the peephole of the door. Tr. 118:22-119:3. Jones also testified that he recalled discussing at deposition "invoking [his] right to self-defense [] when discussing going to the door with a handgun[.]" Tr. 117:19-21. He acknowledged that "[a]t one point" he stated that he "went to the door with gun in hand because [he] didn't know what was behind the door," and that "[t]he thought crossed [his] mind" and "[t]here was potential [] that" it was a protester at his door. Tr. 112:15-18, 112:24-113:2. When asked why he proffered this testimony at deposition, Jones stated that "in [his] mind [there] was [] a state of how, what allows [him] to have a weapon and what allows [him] to protect that room." Tr. 117:22-118:3. Jones testified that he was prepared to defend himself on that day. *See* Tr. 118:4-5.

Jones also testified as to the events following the incident. He stated that thereafter, a supervisor informed him "that there was a complaint and that [Jones] may need to write an email . . . [or] memo." Tr. 112:2-5. Jones stated that he could not remember the specifics of the conversation but asserted that his supervisor told him "that somebody had alleged that [Jones] opened the door, and . . . essentially panicked and had a gun and pointed it at them maybe." Tr. 112:6-11. Jones also stated that the conversation did not include any discussion of potential discipline and that he did not believe he would be subject to

discipline based on the incident because he did not believe there was any inappropriate display of a weapon. *See* Tr. 116:19-117:6. Following the conversation with his supervisor, and shortly after he began his shift on July 29, 2020, Jones sent an email regarding the incident. *See* Tr. 111:7-9, 111:18-23. In the email, Jones stated that he "assumed it was" a teammate because it "seemed the most likely person or people to be knocking on [his] door, but [he] didn't have any reason to expect them, so [he] didn't know." Tr. 112:12-14, 112:19-23. Jones stated that his trial testimony that he had his gun out because he was getting his gear ready was "[b]ased on [his] recollection," and affirmed that his recollection was based on the email he sent on July 29, 2020. Tr. 131:24-133:2.

* * *

The Court, faced with two distinctly different recounting of events, is now tasked with factfinding and ruling as to defendant's liability as a matter of law. For the reasons set forth herein, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

As an initial matter, both plaintiff's and Jones' statements regarding the incident have shifted over time in some ways, and ultimately, the Court must determine the credibility of the testimony proffered. The Court finds that plaintiff's testimony regarding Jones opening the door quickly, reaching behind his back, pulling out a gun, and pointing the gun at plaintiff, has remained consistent over time. On the other hand, Jones has been unable to explain what he was doing with the gun prior to answering the door or whether the gun was loaded and stated that his trial testimony regarding the incident was largely based on the contents of the email memorandum he submitted upon the direction of his supervisor.

Similarly, the Court is largely unpersuaded by defendant's challenges to McKnight's credibility. Ultimately, the Court does not afford great weight to McKnight's testimony, particularly with respect to his analysis of plaintiff's statements and the concept of "presentment," which were together based in significant part on McKnight's understanding that plaintiff is generally unfamiliar with guns. Nonetheless, McKnight's testimony is illuminating as to Jones' statements. Jones is a qualified and experienced CBP agent, and, as McKnight opined, "dangling" is "generally forbidden" and is "not what a

16

professional would be expected to do[,]" and as a matter of handgun safety, people do not generally carry a gun in their hand without having a purpose. Tr. 29:4-19. Furthermore, McKnight opined that the fundamental, universal principles of gun safety require that an individual "always know the status of [their] gun[,]" in part for the officer's own safety. Tr. 31:6-32:12. Finally, McKnight opined that he "wouldn't think" that an officer would ever set a handgun down in a room and then invite a person they don't know into that room. Tr. 33:5-10. To that end, defendant argues that it "doesn't add up" that Jones would put the gun down before inviting plaintiff, a stranger whom he previously perceived to be a threat, into the room. Tr. 139:12-16. However, this argument is unpersuasive where Jones himself testified that after his interaction with plaintiff, and not knowing whether his gun was loaded, he "holstered the weapon and set it somewhere in th[e] general [kitchen] area" of the room before inviting plaintiff in to attend to the toilet. Tr. 118:10-18. For these reasons, the Court concludes that McKnight's testimony ultimately favors plaintiff.

Upon consideration of the weight of the evidence, the Court finds the following facts by a preponderance of the evidence:

1.    United States Customs and Border Patrol ("CBP") Agent Joshua Allan Jones ("Jones") was assigned to work in Portland, Oregon, during the summer of 2020. At that time, protests were occurring in Portland, and Jones was tasked with protecting federal property and employees amidst those protests.

2.    While on assignment in Portland, Jones resided in room 428 of the Residence Inn by Marriott (the "Hotel"), located at 1250 North Anchor Way, Portland, Oregon.

3.    Plaintiff Christopher Frison ("Frison") worked for the Hotel as a maintenance person.

4.    On July 27, 2021, Jones sought maintenance assistance from the Hotel for a clogged toilet in his room.

5.    Plaintiff was sent to attend to the clogged toilet.

6.    Plaintiff arrived at room 428 at some time between 4:00 and 5:00 p.m.

7.    Plaintiff, wearing his usual Marriott staff shirt and holding a toilet plunger, knocked on the door to room 428 and called out, "Maintenance, Christopher Frison."

8.    Jones did not know who was knocking.

17

9.      Jones, wearing plain clothes, opened the door quickly, reached behind his back, and pulled out a gun, which he pointed at plaintiff.

10.     Upon realizing that it was plaintiff, a Hotel maintenance worker, at the door, Jones lowered the gun and then put the gun down.

11.     Jones then invited plaintiff into the room to fix the clogged toilet.

12.     Plaintiff declined the invitation, handed Jones the plunger, and left the area.

13.     Plaintiff filed a Standard Form-95 Claim for Damage, Injury or Death, which defendant denied by letter dated May 4, 2021.

## CONCLUSIONS OF LAW

### A.    Legal Standard

A district court analyzing a claim brought under the FTCA applies substantive state law. *Bennett v. United States*, 44 F.4th 929, 933 (9th Cir. 2022) ("The FTCA [] incorporates substantive state law as federal law to determine liability."); *see* 28 U.S.C. § 1346(b).

Under Oregon law, a plaintiff establishes a claim for civil assault by showing a defendant's (1) intentional attempt (2) to cause harmful or offensive physical contact to the plaintiff, (3) combined with the present ability to carry such intention into effect. *Cook v. Kinzua Pine Mills Co.*, 207 Or. 34, 48, 293 P.2d 717 (1956); *Gakk Inc. v. Acceptance Cas. Ins. Co.*, No. CV 09-6282-MO, 2010 WL 3259905, at *2 (D. Or. Aug. 16, 2010) (citation omitted); *see McLean v. Pine Eagle Sch. Dist., No. 61*, 194 F. Supp. 3d 1102, 1122 (D. Or. July 1, 2016) (citations omitted) ("A claim for civil assault has two elements: (1) the defendant intended to either cause a harmful or offensive contact with the plaintiff, or cause the plaintiff apprehension that the defendant was going to cause an imminent harmful or offensive contact with the plaintiff; and (2) the plaintiff reasonably believed a harmful or offensive contact would occur.").

The "intent" element of a civil assault claim requires a plaintiff to show both that the defendant had "actual intent . . . to do an act" as well as to "cause personal injury." *Cook*, 207 Or. at 59; *Bollaert v. Witter*, 101 Or. App. 654, 658, 792 P.2d 465 (1990). In *Cook*, the Oregon Supreme Court expounded on this principle, stating:

18

> "[A]n assault is an intentional attempt to do violence to the person of another coupled with present ability to carry the intention into effect. . . . We must distinguish between an intent to do an act which may be wilful or wanton and which may result in contact, on the one hand, and an act involving an intent to cause harmful or offensive contact with the person, on the other. An assault [] involves more than an intentional act. There must be the intent to injure. However, the authorities plainly indicate that the word 'injure' refers to legal injury, a violation of a protected right of the one assaulted. It does not necessarily mean bodily and physical injury."

207 Or. at 48 (citations omitted). The intent requirement of an assault claim specifically contrasts against that of claims for negligence, gross negligence, and injury committed to another in a "wanton" manner. *Id.* at 58-59 (describing "wanton" as "the doing of an intentional act of an unreasonable character in disregard of a risk known to the actor, or so obvious that he must be taken to have been aware of it and so great as to make it highly probable that harm would follow, usually accompanied by a conscious indifference to consequences"); *see Gakk Inc.*, 2010 WL 3259905, at *2 (citing *Cook*, 207 Or. at 34; *Safeco Ins. Co. v. House*, 80 Or. App. 89, 721 P.2d 862, 866 n.2 (1986)).

Regarding harmful or offensive physical contact, "[t]he person perpetuating the assault must intentionally place the victim in apprehension of an immediate battery." *Nielson v. Legacy Health Sys.*, 230 F. Supp. 2d 1206, 1212 (D. Or. June 12, 2001) (citing *State v. Garcias*, 296 Or. 688, 692, 679 P.2d 1354 (1984)). "Mere words, even extremely violent words, are not enough[.]" *Id.* (citing *Bollaert*, 101 Or. App. at 657).

Oregon's Uniform Civil Jury Instructions ("UCJI") concisely summarize Oregon law as to assault. The UCJI provide that a plaintiff seeking to establish assault must prove that:

> "(1) The defendant acted, intending to either (a) cause a harmful or offensive contact with the plaintiff; or (b) cause the plaintiff apprehension that the defendant was going to cause an imminent harmful or offensive contact with the plaintiff; and (2) The plaintiff reasonably believed a harmful or offensive contact would occur."

Oregon Uniform Civil Jury Instructions 40.01. "Intent" is established by showing "either (1) the actor desired to cause the consequences of [their] actions; or (2) the actor believed that the consequences were substantially certain to result from [their] actions." Oregon Uniform Civil Jury Instructions 40.06.

## B.    Analysis

Based on the findings of fact set forth above, the Court concludes that plaintiff has proven

by a preponderance of the evidence that Jones intentionally attempted to cause harmful or offensive physical contact to plaintiff and had the present ability to carry such intention into effect.

   *McLean*, while distinguishable in several ways, is nonetheless instructive. In that case, the plaintiff was a former elementary school teacher who filed suit against her employer school district and several district administrators, employees, and school board members. *McLean*, 194 F. Supp. 3d at 1109. Several of the defendants had undertaken an "unannounced active shooter 'drill'" during which they entered the school wearing masks and disguises and each carrying a "'starter' pistol." *Id.* One of the defendants entered plaintiff's classroom and found her there alone. *Id.* "He pulled the trigger. . . . which sounded like a gunshot. Smoke came out of the gun." *Id.* Then, "[t]he [] man said to [p]laintiff, 'You're dead[,]'" [and] ran away." *Id.* The plaintiff alleged four claims for deprivation of her federal constitutional rights and two state law claims, including civil assault. *Id.* at 1109-10. The defendants moved for summary judgment on all the plaintiff's claims. *See id.* at 1110. With respect to the assault claim, the defendants argued that "no evidence exist[ed] to support [the] allegation that [the man] intended for [the] [p]laintiff actually to fear that she was going to be shot[,]" assumedly because the man carried only a starter pistol loaded with blanks and it was ultimately only a "drill." *Id.* at 1122. The court disagreed. *See id.* The court reasoned that under the circumstances, where the plaintiff could not recognize the man, the man pointed a pistol directly at the plaintiff and pulled the trigger, the gun caused a loud noise and resulted in smoke, and the man's statement, "[a] rational trier of fact could find that [the] [d]efendants acted with sufficient intent to establish a claim for civil assault and that [the] [p]laintiff reasonably believed that harmful or offensive contact was imminent." *Id.*

   Here, the evidence shows that Jones opened the door ready to defend himself and his room. By opening the door quickly, pulling his gun out, and pointing it at plaintiff, Jones held the requisite intent to establish a claim of assault—*i.e.*, Jones caused plaintiff apprehension of an imminent harmful or offensive contact and, as an experienced federal officer, Jones would have known that such apprehension would be substantially certain to result from these intentional acts. Like the plaintiff in *McLean*, plaintiff here need not prove that Jones intended to shoot plaintiff or cause plaintiff actual physical bodily injury.

*See Cook*, 207 Or. at 48.  That Jones intended to place plaintiff in reasonable apprehension of imminent harmful or offensive contact is sufficient.  Similarly, whether or not the gun was loaded is, under the circumstances of this case, immaterial.  *See McLean*, 194 F. Supp. 3d at 1122.  Plaintiff could not have known whether the gun was loaded or not, Jones was in plain clothes, and the parties were close enough in proximity that the gun also could have been weaponized against plaintiff in a way other than by shooting him.  Plaintiff's apprehension of imminent harmful or offensive contact was reasonable.

To be clear, the Court is acutely aware that plaintiff has proffered some inconsistent statements over time.  However, the discrepancies in plaintiff's statements regarding the incident—*e.g.*, plaintiff's estimation of distances, heights, and lengths of time; plaintiff's recollection of Jones' statements during the incident; and whether or not plaintiff felt "victimized" by having to work the evening shift—do not alter the core facts giving rise to defendant's liability.  Where, as here, Jones opened the door quickly and pointed a gun at plaintiff, it is ultimately immaterial whether Jones pointed the gun from one inch or several feet away from plaintiff; whether Jones was silent, sighed and stated, "I'm stressed," or stated, "I fucked up, I fucked up"; or whether Jones put the gun down on a table, the couch, the floor, or somewhere else.  Simply put, that Jones opened the door quickly and pointed a gun at plaintiff is sufficient to establish defendant's liability for civil assault.  Accordingly, the Court finds in favor of plaintiff as to liability.

## CONCLUSION

For the reasons stated above, the Court finds in favor of plaintiff as to liability. Within thirty (30) days of the date of these Findings of Fact and Conclusions of Law, the parties shall confer and submit to the Court their availability for a telephone status conference to discuss the damages phase of this case.


IT IS SO ORDERED.


DATED this 26th day of August, 2025.

Adrienne Nelson
United States District Judge